Case number 22-1210 et al. Sinclair Wyoming Refining Company LLC and Sinclair Cassidy Refining Company LLC petitioners versus Environmental Protection Agency. Ms. Dawson for the petitioners American Fuel and Petrochemical Manufacturers. Mr. Holmstead for all other obligated party petitioners. Mr. Perdue for the biofuel petitioners. Ms. Kimball for the respondents. Refiner's arguments regarding volume requirements and percentage standard formula. Ms. McCusker for the respondents, all biofuels arguments and supplemental standards. Mr. Brigato for the interveners API and AFPM. Good morning, counsel. Ms. Dawson, please proceed when you're ready. Good morning, your honors, and may it please the court. Elizabeth Dawson presenting today on behalf of the obligated party petitioners regarding the majority of the issues briefed, after which my co-counsel Mr. Holmstead will address the issue of using 2015 and 2016 RINs for compliance with the supplemental standard. I'd like to reserve one minute of my time for rebuttal. In promulgating the 2022 Renewable Fuel Standard, EPA was finally forced to grapple with what obligated parties have known all along. The RFS program simply cannot achieve Congress's lofty goals, but Congress anticipated this might be the case and included in the RFS program a reset provision requiring EPA to promulgate new applicable volumes based on a review of how the RFS program has worked in the real world. Despite this mandate, EPA continued to increase renewable fuel requirements for 2022 to unprecedentedly high levels, disregarding the statutory criteria in favor of a policy of significant growth. In addition to this error, EPA also promulgated a rule reallocating hypothetical future small refinery exemptions on to non-exempt obligated parties and further erred in a misguided attempt to respond to this court's remand in Americans for Clean Energy versus EPA by promulgating an additional 250 million gallons of renewable fuel requirements in response. But as the court reminded in Americans for Clean Energy versus EPA, Congress did not intend to pursue its goal of increased renewable fuel generation at all costs. Because EPA lost sight of this fact, EPA erred and the court should grant obligated parties a petition. First, I'd like to address how EPA misapplied the reset criteria, and to do so it's useful to remember how we got here. So the Clean Air Act set presumptive annual volumes of most renewable fuels through 2022, but provided EPA multiple authorities to waive those circumstances. Congress also realized that if EPA found itself using these waivers and waiving volumes by a certain amount, 50% in one year or 20% for two consecutive years, the statutory tables would need to be modified going forward. That threshold was crossed for cellulosic and advanced biofuel in 2010 and for total renewable fuel in 2019. So now instead of operating under this structure where EPA is trying to reach the goals that Congress set, EPA has to promulgate new volumes based on a review of the implementation of the program during calendar years specified in the tables and analysis of a number of criteria as set forth in 754502B2 of the Clean Air Act. But instead of applying these criteria in view of how the program has worked out and in view of the fact that the reset provision has been triggered, EPA instead chose to continue the policy of EPA used the criteria to justify even higher volumes, higher than the original volumes assigned for 2020 before the pandemic forced EPA to reassess. And to reach this result, EPA committed a foundational error. EPA returned to those statutory tables as a baseline for its analysis instead of looking to the implementation of the program as Congress instructed when the reset provision is activated. This makes no sense since reaching the reset requirement already means that statutory tables have missed the mark. So EPA improperly put its sum on the scales in favor of higher applicable volumes. This error is only increased when considering that EPA promulgated this rule for 2022 six months late. EPA was supposed to promulgate this rule 14 months before the year started by October of 2020. And in the past, EPA has considered actual fuel consumed when promulgating late. This year, instead, EPA looks to just the first three months to project forward, but didn't recognize that it was issuing the rule with half a year over. Lastly, EPA failed to explain how it justified these heightened requirements when the reset criteria required looking at the impacts of these requirements, prioritizing increased renewable fuel. For example, EPA looked to increase the renewable fuel requirements to the criteria required EPA to look at the impacts of renewable fuel on infrastructure and the ability of infrastructure to reach the goals. In sum, in promulgating these higher than ever volumes, EPA misapplied the factors that Congress intended to return the RFS program to reality. Now, turning from those projections to the formula for turning those projections into presented standards, EPA can't defend its decision to reallocate hypothetical future exemptions to non-exempt obligated parties. In doing so, the agency, in its own words, codified speculation and prejudgment. First, EPA identifies no statutory authority for this action. There is none. As both EPA and obligated parties have argued before this court, the statute nowhere authorizes the approach the agency took here. So, EPA can't cobble together silence with a general direction to ensure that applicable volumes are met to overcome a specific statutory language that authority exists, EPA hasn't sufficiently explained why something it once thought was nigh impossible is now the best reading of the statute. Indeed, this change in policy makes even less sense in this reset posture, for EPA was required to promulgate the applicable volumes with 14 months lead time. So, the idea that it could possibly accurately project future exemptions in that scenario is risible. Finally, in a turn to... Did you say risible? Yeah, I did. Okay, that's strong medicine, but we'll take it. Can I just ask on this one, what do you think EPA should have done with the small refiner exemptions? Should they not... I thought what they did was they took something that previously was limited to exemptions that had already been granted, and then expanded it to encompass exemptions that they projected would be amount that's going to be off the table because of the small refiner exemptions. Am I understanding the factual terrain correctly? That's correct. And then is your view that you just can't take small refiner exemptions out of the mix period, regardless of whether you're talking about ones that have already been granted and ones that have been projected, or that actually the error wasn't adding on to the ones that have already been granted, the ones that are projected? Well, your honor, in this rule, EPA only promulgated a rule addressing future projected exemptions. The past exemptions had been part of the rule, and that is beyond challenge in this particular rulemaking. But in terms of your theory, do you think that EPA wasn't allowed to do what it did with respect to the projections? Well, the statute certainly does not allow EPA to project forward in the future. Is your claim about what the statute disallows EPA to do also something that would prevent EPA from taking into account the small refiner exemptions that have already been granted? Well, the statute does not speak to that either. Again, we can't challenge that in this rulemaking. Theoretically, the argument, the answer is yes, that you're not drawing a distinction, in other words, between EPA's ability to take into account small refiner exemptions on a projected basis and EPA's taking into account the exemptions that have, in fact, already been granted. Correct, your honor, because the statute only speaks to one way to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt. And that is not the provision that EPA has invoked here to authorize what it's doing. I see that I'm out of time. I'd just briefly like to cover the last issue. So in a belated attempt to respond to this court's partial remand of the 2016 standard in Americans for Clean Energy, EPA added 250 million gallons of a supplemental requirement onto the 2022 standard. But in addition, the statute speaks not to this possibility, and EPA can't hide behind the should not require the agency's approach. So for all of these reasons, we believe the court. Isn't it a fair implication of the ACE remand that it did intend some requirement to be imposed? And if not, as it was done, what would be the preferable way? Well, EPA had several options as it took the standard back that it could have employed, because what the court did in Americans for Clean Energy was dispute and disagree with EPA's reading of inadequate domestic supply. The court didn't conclude that it was wrong looking at all the facts for EPA to waive those 500 million gallons. So EPA could have taken another look at the record and in its statutory authority and, for example, use the cellulosic waiver, which it had not invoked to the tune of 380 million gallons, and then decided whether there was a way to address the 120 million or to exercise some other waiver authority. But it just didn't take that time. It just saw 500 million split in half and added it to 2022 and now to 2023. And if its determination was that absent the authority that it misread, that the obligation should be met, you're not arguing for in two years to try to make it less onerous. Other than your argument that they should have retroactively exercised cellulosic waiver, how else should they have dealt with this? They could have invoked the severe economic harm waiver, which had been a possibility back in at the time of the rulemaking. Or it could have considered whether the 250 gallons made sense in light of the fact that it was issuing a reset rule where it was supposed to look at the overall picture of the implementation of the program. So your basic argument is figure out some way not to require it. I'm sorry? Figure out some other authority under which to not require that that 500 million gallons be made. Correct. This is just a completely unreasoned adding back in what it believed this court said it erroneously. And I think you said they exercised authority, but they don't think they exercised that reset authority, right? No, EPA did exercise this reset authority in 2022. But as to the 500, as to the ACE remand? As to the 250, EPA divorced that from the reset. So when EPA addressed the reset factors as to the 20.63 billion gallons, but then added on this 250 million gallons and didn't include that in its conception of the reset. So why wouldn't the right remedy for that be a remand for them to fold that 250 million gallons in and run the analysis again? Well, Your Honor, we think they need to take an entirely new look at how they promulgated the 2022 rule because they looked at it with a view to increasing the renewable fuel obligations instead of looking at what was realistic. But that is a possible- But had they done that, had they folded it in with the 20 whatever billion gallons, you wouldn't have a claim, would you? And done the analysis. We would still think that EPA would have to justify its ability to roll 250 million gallons from 2016 into 2022, which it just didn't justify in this case. Well, it spent a lot of time talking about where to put it. Well, they considered other options, but we submit that they did not actually fairly consider the other things they could have done to address the remand instead of just adding it onto 2022. And now I'll leave the remainder of my time to Mr. Holmstead. Okay, thank you. Thank you. Mr. Holmstead? May it please the Court, Jeff Holmstead here to address just one issue. If the supplemental standard is upheld, an obligated party should be able to meet it by using valid RIMs that could have been used for 2016 compliance. The only reason for the supplemental standard is to make up for 250 million gallons of under-compliance in 2016. But some companies still hold valid RIMs that could have been used for 2016 compliance, but were not. These RIMs represent roughly 39 million gallons of over-compliance in 2016. In some cases... You refer to them as valid RIMs, but the RIMs by their nature, they expire. Right, they are expired. So they represent an actual, you know, they've been separated because they represent an actual use of the... That's correct. When I refer to valid, that means that they represented, each one represented a gallon of renewable fuel that was used during 2016. And I should explain, some companies submitted these very RIMs for 2016 compliance, and then got them back from EPA when EPA belatedly granted their small refinery exemptions. But by the time EPA returned the RIMs, the RIMs were worthless. They couldn't be used for 2016 compliance. Since these RIMs represent renewable fuel that was actually produced and used in 2016, commenters on the rule argued that they should be allowed to use those RIMs to comply with the supplemental standard. EPA offers just two reasons for rejecting this approach. First, EPA argues that, quote, this is not permissible under existing RFS regulations. But this is just silly. Imposing a supplemental standard wasn't allowed under EPA's regulations until EPA issued a rule to do so. In the same rule, EPA should have allowed companies to use valid but unused RIMs to comply with the supplemental standard. The only other reason that EPA offers is a speculation that some of the unused RIMs may not be valid. This might be true, but there is absolutely no reason to believe that anyone would unlawfully use invalid RIMs now when they chose not to do so in 2016. I mean, when you say that it's silly to argue that it's not permissible under existing regulations, it's one thing to do a year-specific remedy or set standards. It's another thing to change the nature of RIMs. But commenters pointed out that they would not need to change the nature of RIMs. Commenters actually explained a very simple way that EPA could do this by allowing companies that had valid RIMs that were unused to meet a 2016 supplemental standard instead of a 2022 supplemental standard. EPA never explained anywhere in its response to comments why that wouldn't work. EPA said it would be entirely unadministrable, but they did address that. No, it doesn't address the proposal that we actually made. They created a strawman that makes it look like it would be very difficult, but it would not be difficult, as commenters explained. And EPA could do what it's done in other cases, including a case that it was required to do in the Ninth Circuit when a court said that when a company was stuck with unused RIMs, they could use replacement RIMs, which would essentially replace the expired RIMs with current vintage RIMs. So they had easy ways to do this, but they just chose not to. Thank you, counsel. We'll now hear from the biofuels petitioners. For their set of challenges, Mr. Perdue. May it please the court, William Perdue on behalf of the biofuels petitioner. I'd like to reserve three minutes for rebuttal. In the final rule, EPA set the required cellulosic volumes too low based on a misreading of the cellulosic waiver provision. In particular, when calculating the projected volume available, EPA failed to include volumes of cellulosic biofuel that are reflected in carryover. I'd like to start with the text of the cellulosic waiver provision. That provision requires EPA, when the waiver is triggered, to reduce the required cellulosic volume down to the projected volume available during that calendar year. The party's dispute about that language is actually very narrow. EPA agrees with us that the projected volume available means the projected volume of cellulosic obligations. That's on page 25 of EPA's brief. EPA also agrees that obligated parties can show compliance by retiring carryover. And EPA also agrees that all RINs, including carryover RINs, represent actual physical volumes of cellulosic biofuel that have been produced or imported. The only distinction is that carryover RINs represent fuel that was produced or imported last year, not this year. But that distinction makes no difference to obligated parties when they are retiring RINs to show compliance. By retiring carryover RINs, obligated parties can count fuel that was produced or imported last year towards compliance with their volume obligations this year. So, the question in this case really is, when projecting the volume of cellulosic biofuel that is available for compliance during 2020, for example, does EPA have to include all of the cellulosic biofuel that is available for compliance during 2020, even if some of that volume was produced or imported during 2019? And that question should answer itself. The projected volume available means all of the projected volume available. Although under 7545.07d.1, the provision starts talking about projected volume of cellulosic biofuel production. And then later it talks about the projected volume available. Why isn't it at least reasonable to read the projected volume available with reference to the introductory clause talking about projected volume produced, projected volume of cellulosic biofuel production? So, I mean, the difference that seems to be between EPA's position and yours is you're talking about what's available for compliance, and it's talking about what's available in the sense of having been produced. So, their view is impermissible? Yes, it is impermissible. And I'd like to clarify what the interpretation you began by explaining, referencing the projected volume of cellulosic biofuel production at the beginning of that provision, that having the projected volume available refer back to that. That is the intervener's position. That is not EPA's position. In EPA's view, two things have to be true about this volume during the calendar year. Take 2020, for example. It has to be available for compliance. Everybody, EPA and we agree about that. And it has to be produced or imported in that year. Going to the intervener's interpretation, so their view is that the words at the end of this paragraph refer back up to the words at the very beginning. But that is, if EPA, if Congress wanted to refer back, have the projected volume available to refer back to the projected volume of cellulosic biofuel production, it would have just repeated the same term, projected volume of cellulosic biofuel production, or it would have used shorthand like such projected volume of production. What Congress would not have done if it was referring back to production is introduce a new term, projected volume available, that uses a new word, available, that is not contained in the original term that Congress is supposedly referring back to, projected volume of cellulosic biofuel production. You don't think it's possible that the reason Congress didn't use the exact same terminology is that they didn't want to leave EPA without any discretion in the matter. They wanted to use a term that gave the EPA discretion on whether to treat the term as coextensive with production or to do what you'd rather have them do, which is to take into account the carryover risk. I think available means available. I think there are three different volumetric terms in this paragraph. There's the projected volume of cellulosic biofuel production. There's the applicable volume of cellulosic biofuel. And there's the projected volume available. So if taking those in order, it's basically the projected volume produced. And then there's volume required. And then there's the volume available. I think the most textually faithful reading of that term is of those terms is each of those is referring to a different thing. Another way of reading it, though, is that there is in the first clause, projected and applicable, and in the later clause, applicable and projected, and that the projected is talking about production and the applicable is talking about compliance. So when you get down to the sentence that we're parsing here for the clause, the administrator shall reduce the applicable volume of cellulosic biofuel required compliance to the projected volume available produced. So EPA's reading is that it is the projected volume available for compliance. They agree with us about that. They just believe that in effect, EPA is adding a limitation into the statute. They believe that what the statute really means is the projected volume available and produced or imported during that calendar year. I think maybe I can use the example that's on page six to seven of our reply brief to illustrate how EPA's interpretation works and why it is inconsistent with the statute. So consider two gallons of cellulosic biofuel. One gallon is produced on January 1, 2020, and it generates a vintage 2020 RIN. The other gallon is produced one day earlier on December 31, 2019, and it generates a vintage 2019 carryover. Other than that, there's no difference between these two gallons. They sit in the factory for a few days. It takes them a few weeks to filter through the distribution system, and eventually they're combusted in a consumer's vehicle on the same day sometime in 2020. Both of those volumes are physically available to obligated parties. Both of those volumes are physically available to consumers during 2020. The RINs that are generated by both of those gallons are available to be retired towards compliance with 2020 volume obligations. But EPA counts only one of those gallons in the projected volume available. There's just no basis for that distinction in the statute. But the statute has taken a lot of care in its rules to limit RINs to the existing year and one carryover year, to allow carrying over of deficits to meet in the following year. And your reading is equating last year's RIN with this year's RIN, which EPA is taking care not to do. I mean, and, you know, its main, I guess its main argument in the rulemaking is this would require basically bottom out the RIN bank. And I understand you think that's not a legitimate objective, but it is a different, very different treatment of prior year RINs. I think our only point about prior year RINs is that they are, everybody agrees with us that they are available to be retired to show compliance. True enough. And the statute says available. These RINs are available. So really this, you know, you can think about the volume available for compliance is by definition equal to the number of RINs that are available to be retired. That's just what RINs are. They're a record keeping system to track of which volumes of fuel are available to be counted towards compliance. Judge Pillard, you also asked about this issue of zeroing out or drawing down the RIN bank. And I think it gets to a broader point, which is that we believe our interpretation is really the only one here that gives effect to Congress's choices about how to stabilize the cellulosic market, both on the supply side and on the demand side. So on the supply side, to deal with the problem of insufficient supply, Congress created cellulosic waiver credits. These credits are illiquidity. I think that's undisputed. When those credits are available, cellulosic RINs will never be too scarce or too expensive for obligated parties to be able to comply with their cellulosic obligations. They can just buy cellulosic waiver credits. But insufficient supply is just one side of the coin. There's also insufficient demand. And under our reading, and only our reading, Congress addressed the problem of insufficient demand as well. Specifically, Congress directed EPA to set the required cellulosic volume at the projected volume available for compliance. That ensures that demand is high enough to soak up all of the volume that is available for compliance. And insufficient demand is not just a theoretical problem. It really actually happened in 2018 and 2019. Over a multi-year period, there was a buildup of the carryover RIN bank, and cellulosic RIN prices crashed from $3 down to about 50 cents. And our interpretation takes dead aim at that problem. It addresses that problem directly. EPA automatically would have set demand high enough to soak up all of the extra supply in the form of those carryover RINs. So EPA stresses this idea of compliance flexibility. We understand that's a real issue. But Congress addressed it specifically and in detail in the provision dealing with cellulosic waiver credits. But EPA's interpretation leaves the program with no way to deal with the problem of insufficient demand. And if there's insufficient demand, that's a big problem for this program, because the whole point of the program is to incentivize production by having sufficient demand and having that demand increase year over year. So our interpretation is the only one that has automatic stabilizers in both directions so that supply and demand stay in balance. Thank you, Council. We'll hear from EPA's Council now. Skimble. Good afternoon. I'm Department of Justice Trial Attorney Karen Kimball here today on behalf of EPA. With me is my colleague Caitlin McCusker, also from DOJ, and also Susan Staley from EPA. Ms. McCusker and I will be dividing our time today. I will address refiners' arguments regarding the 2022 volume requirements. I will then address refiners' arguments regarding EPA's reaffirmance of the revision of the percentage standard formula. And my colleague, Ms. McCusker, will address all of biofuels' arguments as well as the supplement standards. EPA reasonably set and fully explained the 2022 volume requirements for total renewable fuel and advanced biofuel under its reset authority. EPA used the structure of renewable fuel volumes Congress set forth in the statute. Thirty-six billion and modified those volumes from $36 billion for total renewable fuel down to $20.63 billion for total and from $21 billion gallons for advanced fuel down to $5.63 billion gallons for advanced. EPA did that with consideration of both the implementation of the program and also the statutory factors. The statute sets forth both qualitative assessments like environmental impacts, infrastructure development, and social impacts of job creation and rural economic development, and also more quantitative assessments like consumer costs of transportation fuel and other factors. Notably, the statute leaves EPA full discretion to determine both how to assess each of these factors and how to weigh them against each other. As this court has explained, when the statute does not state what weight should be accorded to the relevant factors and instead gives EPA discretion to make those determinations, EPA is given considerable discretion to weigh and balance the various factors required by the statute. Your EPA considerable is not unlimited though. That's correct. And so you have your RIA has this very striking chart at the beginning and it seems very thorough in listing out costs and benefits. But it's also very striking in that it contains exactly two numbers. One is the benefit of increased energy security, which you quantify at $294 million. Another is the cost of increased fuel, which you quantify at $7 billion with a B. So where and, you know, the other huge one is obviously greenhouse gas emissions for which you give an illustration and you sort of ask us to ignore it, but you sort of ask us to consider it. Where in EPA's analysis do you, what's the rationale for saying that the $294 million and other benefits outweigh the $7 billion and many other costs? At JA 24 to 26, EPA explained how it balanced the factors and it explained that the qualitative factors like the production of consumer fuel and the necessity to incentivize the program or incentivize renewable fuels. You said it, you said we've looked at all of these and we think one side outweighs the other, but where's the explanation? And the best I could find is this, you know, bottom of 24 is to sell you LASIC and you say some factors such as fuel cost cut in one direction, others such as climate change cut in the other, and we believe those, one outweighs the other. And that's a statement of the conclusion of the balancing. It's not a rationale. So throughout 24 to 26, EPA explained that it placed a lot of emphasis on the structure that Congress set up. So Congress set up a structure that was nested and started with the cellulosic and then total. And it retained that structure so that it was maintaining the structure while also considering all of the factors. And when considering all of the factors, it considered the fact of, it considered the production of renewable fuels, considered that production was directly in line with what it was, what it was proposing as the volume for the reset. It also considered that more social benefits like rural economic development and job development and the incentivizing of the infrastructure for advanced biofuels and for total renewable fuels, that all of those factors weighed in favor of not reducing the volumes more. Maybe, but I mean, your own chart shows, I don't know, one, two, three, four, seven, 10 to 15 costs, which are on the other side, most of which are environmental costs. And what's the rationale for ignoring impacts on air quality, biofuel production, impacts on wetlands, ecosystems, and wildlife, land use change, impacts on soil and water quality from biofuel, foodstock production, impacts on water quantity, et cetera? Maybe it's certainly not ignoring those factors. It's considering all of that. Fair enough. But what's the rationale for saying that all of that is outweighed by reduced greenhouse gas emissions or the 294 million in increased energy security benefits? And also the production of the renewable fuels and the incentivizing of the structure. The whole point of the statutory scheme is to incentivize renewable fuels. So reducing beyond, and renewable fuels have always been more costly than conventional fuels. So always there has been a monetary cost to this program. And EPA explains that maintaining that structure and maintaining congressional intent was important. And so there wasn't a justification for decreasing the volumes even more down below where fuels are being produced. And which also gets to my colleague's point regarding the retroactive nature of the rule. The 2022 rule was partially retroactive and EPA explicitly considered what volumes had been produced in that rule. It considered the fact that there had been substantial increase in production of, or the pandemic dramatically decreased volumes in 2020 and 2021. EPA fully explained its analysis throughout and the volume should be upheld. I'll move on to the formula unless there are further questions on the volume. EPA also reasonably reaffirmed its provision of the percentage standard formula to address projections of all fuels expected to be exempted through small refinery exemptions. Pursuant to its statutory mandate to determine and publish annual percentage standards that ensure that the volume requirements are met, the formula takes volume requirements for each fuel type and divides it by the total fuel subject to the RFS regulation. Since inception of the program, EPA has removed an amount of fuel projected to be exempted for small refinery exemptions at the time of the rule from the total fuel in the denominator. As we approached 2020, EPA was granting more and more small refinery exemptions after the grant rule and the percentage standard formula was no longer ensuring that the volume requirements were met. Accordingly, EPA determined that the way to best achieve the statutory mandate to ensure that the volume requirements were met was to project the fuel that would be exempted using the policy in place and to do so on an annual basis in order to ensure that all fuel that's in the denominator is fuel that's in the RFS system. Because EPA fully explained this rationale, the standard formula should be upheld. If the court has no further questions, then I'll turn it over to my colleague. Thank you, counsel. Good morning, Your Honors. I'm Caitlin McCusker from the Department of Justice here on behalf of EPA. I wanted to start with the biofuels producer's argument and then I could turn to the supplemental standard. With respect to the cellulosic waiver, EPA interpreted the phrase projected volume available during that year, during that calendar year, as it always has to include actual fuel, not credits representing fuel from the prior year. That interpretation is consistent with the plain language of the statute and the statute's purpose and structure. And this exact distinction is the one that this court recognized in ACE. There's a distinction between actual fuel and credits that represent that fuel. A word about my colleague. How so? Can you give us just a little bit more practicality? Because surely Mr. Perdue is right that a Wren is a Wren in the sense that it only comes into being if fuel is produced. Sure. And this goes to my colleague's notion that we agree that the fuel has to be available for compliance. We do agree that the actual fuel needs to be Wren generating fuel. We are not reading in a limitation to the statute that's not there. The phrase itself limits itself to the projected volume available during that calendar year. That's where the difference is in. Well, it's available. It's just not projected to have been first made available during that calendar year to be produced during that calendar year. The fuel that the Wren represents, though, is from the prior year. Yeah. No, I get that. I'm just looking at the language and trying to push back on your reading. So you don't agree. Sounds like Mr. Perdue said you don't agree with the intervenors that equate the volume of cellulosic biofuel production in the first clause with the projected volume available during the calendar year. EPA didn't resolve that statutory question, whether those two terms could be ensured to mean the same thing. But I do think that my colleagues point that the earlier rejection referring to actual fuel is illustrative that when we're talking here, we're again talking about fuel and not credits representing fuel. The biofuels interpretation would have this court require EPA to include Wrens, which would functionally eliminate the Wren Bank. This court has observed that the Wren Bank is of vital importance to the RFS program and the renewable fuels market. Their policy arguments also missed the mark. There's no support for them in the record. And in any case, they're not a reason to rewrite the statute. With respect to your reliance on ACE, because I take the point that their ACE also construed something that's somewhat analogous, but then that didn't have the textual features that the other side is relying on to make the argument that there's a difference between cellulosic biofuel production and projected volume available. I'm sorry, could you repeat that question? Yeah, so you rely on ACE for the proposition that there was a similar issue that came up in ACE that had to do with whether you count the Wrens, the carryover Wrens. And if you apply that same analysis here, then EPA's interpretation would prevail. And I guess what I'm saying is, but that issue in ACE didn't involve the same statutory language that is involved here. And the argument that's being made under the statutory language that's involved here is that there's two phrases that matter. One is projected volume of cellulosic biofuel production, and the other is projected volume available. And they're different. And your resolution ends up equating them. Well, I think that it's not necessarily the case that they're equivalent. EPA hasn't always been consistent in how it's interpreted the projected volume of cellulosic production. Sometimes it's suggested that it may not include imports, which would be a difference between the two terms. But I think going back to ACE, the analogy between the two statutes is that, first of all, they're both involving EPA's effort to establish annual volumes for the year. Neither of the credit or neither of the provisions mentions credits, which if Congress wanted to include credits, it knew how to reference those credits, which are promulgated or initially set up in paragraph five of the statute. They didn't make any mention to that. And it's true, there are some differences between the statutes, but I think those textual differences, ACE court's observance of the fact that the statute doesn't pursue market forcing at all costs, and the critical importance of RINs to the program, that rationale applies with equal force to the statutory provision here. You're also talking about the supplemental requirements? Yes. So you say in the final rule that the total renewable fuel obligation for 2022 is 20.87 billion gallons, the 20.63 plus the 250 million gallons for the supplemental standard. But the assessment under the reset authority only considers the 20.63 billion gallon amount. Why shouldn't the reset authority analysis have been applied to the entire? So EPA promulgated the supplemental standard pursuant to a different statutory authority and a different rationale. With respect to the interplay between the supplemental standard and the reset analysis, I'll note at the outset, the petitioners haven't challenged the reset analysis on this basis. The reset analysis required EPA to balance a multitude of factors and establish an appropriate volume for the year. That's what EPA did. The supplemental standard was an effort to respond to this court's remand in ACE. EPA's authority to do that was based on its original authority to promulgate standards in the first instance. And so EPA viewed these as separate exercises. And although it ensured that both standards were feasible and achievable, it kept its analyses separate. How is it reasonable to subject obligated parties that weren't even in the market in 2016 to 2022, to the supplemental obligation in 2022? Your Honor, EPA felt that it had to take a concrete step to address this court's remand. Any approach that it considered would have imposed some burden on some obligated parties. Reopening 2016 compliance would have been particularly difficult and likely infeasible because it would have involved unwinding years of compliance. It's also true that obligated parties have since exited the market, meaning that if EPA had imposed this as a retroactive 2016 standard, it would have been setting up the program to either fall short or would have had to redistribute that obligation across other obligated parties. And so EPA just felt that that wasn't a good option. And in fact, that the approach it took was better mitigated. Why not just max out the cellulosic waiver authority? EPA did look at that and it found that the application of either the general waiver or the discretionary component of its cellulosic waiver wasn't supported by the record. In particular, with hindsight, we know that the 2016 market outperformed. That means it generated 800 million excess RINs. So the notion that the 2016 market conditions would support application of either of those waivers is unfounded. And it looked at the market in 2022 and determined that the volume set was both feasible and achievable. I asked your colleague about cost and benefit of the 22 volumes, and she rightly defended them as the agency wants to push the outer limits. And renewable fuel is good under this scheme. More renewable fuel is better. And you even said that the volumes you're setting are higher than what the market has produced. I mean, if you're saying all of that to set a very aggressive volume level, it just seems really tough to then say, like, completely divorced from any, all of that. We're going to just add in this other obligation, the amount of which sort of has nothing to do with what's feasible for 22. Well, I don't know that we'd agree that it was an aggressive volume that we set. Under the reset factors for total renewable fuel, we set what we thought was an appropriate volume, but it wasn't a maximum achievable volume. And EPA did do a feasibility and achievability analysis for the supplemental standard and the total renewable standard and found that the market. We acknowledge the implied conventional volume is higher than the volume of these fuels projected to be consumed in the U.S. in 2022. All of that is before you get to this additional obligation. Yes, your honor. My understanding is that the data that they were looking at when they were setting the 2022 total volume was based on the growth that they were already seeing in the market. So I don't think it was aggressive by any means. I wanted to say a word about my colleague's suggestion that EPA could have allowed the use of 2015 and 2016 RINs. That's not the case. Doing so would have been inconsistent with the statute. Paragraph 05C provides that RINs have a lifespan of 12 months. Allowing the use of 2015 and 2016 RINs would have been contrary to that. Moreover, EPA explained at JA 533 to 34 that it couldn't confirm that the RINs that people had in their accounts were valid. And so the representation that those RINs necessarily represent actual fuel or over compliance is not one that EPA would agree with. You don't mean valid as in unexpired because of course they were all expired. So what is the validity concern? So EPA, the way the program works is on a buyer beware system. When obligated parties retire RINs, they are responsible for ensuring the validity of those RINs. It's not unusual that parties would have older vintage RINs in their accounts. Sometimes that happens because they determine that they're not valid. They don't actually represent fuel. And so they don't trade them any further. They don't use them for compliance. They just kind of sit in the system. And EPA explained that it didn't, given the passage of time, have the ability to go back and confirm the validity of it. Can you just give me just like a little illustration of what would be the source of an just some scenario or example? Sure, a party could hold a RIN for fuel that was ultimately exported and that RIN would no longer be valid. It should be retired upon being exported. But if it wasn't, it would just sit in the account and a party wouldn't likely use that for compliance. With the passage of time, it's just harder to check on. Correct. What's the what's the reason not to back out, once again, the obligated parties that didn't exist in 2016? I think just administrative possibility, EPA and also consistency with the sort of theory of what EPA was doing, which is that it was imposing a 2022 standard. It was using the gas and diesel projections for the year that it used for the 2022 standards otherwise. And it just would have been, I think, inconsistent if it had backed out certain obligated parties. It would have put a disproportionate burden on the remaining parties. It's one thing you had mentioned. Correct. I was speaking about the if they had gone back to 2016. But I think that general concept would be true here, too. And I just wanted to say, I see I'm out of time, but one quick word about the reset, which is that there's no dispute that EPA conducted a reset analysis for the cellulosic biofuel. The argument is amounts to basically that the reset analysis is required to come out in the same way as the cellulosic waiver analysis. That's not what the statute says. It doesn't incorporate the scope of the other waivers and its framework, even if that's what led to its triggering. Thank you, your honor. Appreciate your time. Oh, and for those reasons, we think that all the. Thank you, counsel. Mr. Borgato. Good afternoon, your honors. May it please the court. Thomas Borgato on behalf of the American Petroleum Institute, American Fuel and Petrochemical Manufacturers. Our position is that the phrase projected volume available unambiguously refers to actual physical cellulosic biofuel produced during the calendar year that is available for compliance, not credits carried over from a prior year. I think there are three textual indicators in the statute that compel that. So looking at the statute first says projected volume of cellulosic biofuel production. Nobody disputes that that refers to actual physical cellulosic biofuel production during the year. Then it goes on to say projected volume available. We think that the repeated use of projected volume is key. Shorthand, it's referring back to the same projected volume referred to in the first clause of this provision. Now, it's true that there's an additional word here that words available, but it serves a different purpose than the ones that one biofuels petitioner suggest. The word available requires EPA to conduct an evaluation of whether the projected biofuel is actually available to be used for compliance. There are circumstances such as when fuels exported are not used for transportation fuel, which makes it not available. So available serves a narrowing function, not an expanding function as biofuel petitioners contend. Second textual clue. The term volume is used four times in this sentence. Projected volume, minimal applicable volume, applicable volume, and projected volume. The first three, undisputed, all refer to actual physical volumes of fuel. The fourth one would be an anomaly. There's no explanation as to why it should include credits in addition to actual physical fuel. It is actual physical fuel. It's just from a different year, right? Well, it's not. If you look at biofuel petitioners brief, they say that the RINs reflect physical fuel. They're not themselves physical fuel, and our contention would be that the RINs do not fall within the definition of volume. Because everywhere in the statute, and this is the third point I want to make, everywhere in the statute where the term volume is used, it's referring to actual physical fuel, not credits. When Congress refers to credits, it says credits, and it does that plenty of times throughout the statute. So we think that trying to cram in credits into the word volume on its own is textually not supported by the structure of the statute, and these additional textual clues make that conclusion even clearer. Just a quick word about the court's decision in ACE. I think the case here is even stronger than an ACE, that credits don't count. An ACE at issue is the word supply, and supply is not a commonly used term in the local fuel standard statute. The court had no problem concluding that supply referred to supply of renewable fuel and not supply of renewable fuel plus credits. We have a similar situation here, it's just with the term volume. And as I've explained, volume is consistently used to refer to actual fuel and not credits. So the case here, I think, is even clearer than an ACE, that volume cannot be construed to include credits, can only be interpreted as referring to actual fuel produced during the calendar year. Can I just ask you this one question? The last phrase is projected volume available. One thing that Congress could have done is instead of used available, they could have used produced. And then it would have been a direct equivalence between the first phrase or any calendar year for which the projected volume of cellulosic biofuel production, that would have been projected volume produced. But you think that it was intentional actually not to use produced and to use available because  Correct, Your Honor. Congress intended to account for a situation where biofuel would be produced, but for some reason not ultimately be available for compliance purposes. Again, that could be if the fuel was exported or if the fuel was not used for transportation fuel. So available serves as a check, basically, against overestimating the amount of fuel that would actually be available for use for compliance purposes. And would that not also apply to the first two cellulosic biofuel production? Would there not have also been the felt need to exclude from that figure the stuff that's unavailable for compliance? Well, in the first use of the phrase, we think it's a broader use because it's just asking about what's produced. That phrase is not asking about whether the production is, in fact, going to be eligible for RFS compliance purposes. But yeah, I guess then what I'm asking is, does that make sense? If Congress is saying in a situation in which blank is less than the statutory amount, then go and reduce it. Does it make sense to think of blank as everything that's been produced? Or would it make more sense to think of blank as only that which has been produced and is available? I think the text supports the conclusion that it's everything that's been produced. And I think that's in part because it's supposed to be a pretty technocratic decision with respect to the first clause. EPA is making its decision based on an Energy Information Administration estimate, and the EIA is not in the business of determining whether fuel is eligible or not. So you have this first, more technocratic determination of what is produced, and then you go on to this EPA expertise decision of whether it's actually available in the second clause. Thank you, counsel. Thank you. Dawson, I think you asked for one minute. We'll give you one minute. Before we start, can I ask you a question about the statute forbids the imposition of redundant obligations on any person in O3C1? Can you give me an example of what that's referring to? So, Your Honor, EPA has not definitively interpreted that provision, to our understanding. But we believe that the reallocation framework does run afoul of this provision in that if EPA is wrong, if EPA projects exemptions that don't end up getting exempted, then you have the original potential small refinery complying with an obligation and another non-exempt small refinery or any refinery complying with the same obligation twice. It just means effectively that EPA set the standard high. I'm turning to the two quick points on rebuttal. First, to clear up any confusion, we did raise the issue that EPA had to apply the reset to supplemental on brief page 35 and clearing up confusion on EPA's part reply brief page 18. And the second point is, as Judge Katz has pointed out, excuse me, EPA's explanation of the disparity between the costs and benefits leaves something to be desired. And ultimately, the rationale is simple, that it just wanted to increase renewable fuel. But that ignores entirely the circumstances animating the reset. Thank you, counsel. Mr. Perdue, we'll give you two minutes because we added time for the position that's acute contrary to yours. So we'll give you two minutes to respond to that. EPA and the interveners try to frame this case as being a dispute about the volume of volume of fuel versus volume of benefits. That's not what this case is about. We agree with EPA that volume here means the volume of generating fuel. The question is, is it all of the generating fuel or just some of it? Do you think it's all of the fuel that generates that can be retired in the relevant year, whether they're present year, present year vintage or carryover? Or all of the generating fuel that was produced in the year. But let me let me address that directly. I think so. The statute's got three terms, three volumetric terms, and all of them are different. There's a projected volume of cellulosic biofuel production. There's the volume of cellulosic biofuel required. And there's the projected volume available there. Congress used three different terms because it was talking about three different things. And I think it's important to emphasize that EPA does not believe that the last term is a subset of the first. That's not their position. That's the intervener's position. It's not EPA's. That's because in EPA's view, the first term is production. And in EPA's view, the last term includes net imports. So net imports are not a subset of domestic production. You've got to include net imports. And for exactly the same reasons that you include net imports, you should include carryover. They are available for compliance. That's as simple as that. The last thing I want to say is just a word about ACE. It was brought up multiple times. ACE involved a different statutory provision with different statutory text as applied to a different fuel category. ACE contains some general discussion about carryover RINs. All this court actually concluded in that case is that it was within EPA's discretion under the discretionary general waiver for EPA to consider the possibility that without a RIN bank, obligated parties might have no way to comply with the total renewable fuel obligation. That just has no application here where this provision of this statute is mandatory. And because of cellulosic waiver credits, you can't have a situation where obligated parties are simply unable to comply. Cellulosic waiver credits mean they can't comply. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Katsas